CONGRESS SQUARE HOTEL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4277.   Promulgated February 13, 1945.

*Leonard A. Pierce, Esq.,* for the petitioner.
*C. A. Stutzman, Jr., Esq.,* for the respondent.

### OPINION.

ARNOLD, *Judge*: This case involves corporation income, declared value excess profits, and excess profits taxes for the calendar year 1941 in the aggregate amount of $30,441.65.   Certain adjustments were made by respondent which are not here contested.   A stipulation of facts containing certain exhibits was filed and we incorporate it herein by reference.   The case hinges on whether the unamortized discount and expenses of old bonds are deductible in the taxable year, as contended by the petitioner, or should be amortized over the life of the new bonds, as determined by respondent.

Petitioner is a Maine corporation, with its principal office in Portland, Maine, and its return for the period here involved was filed with the collector of internal revenue for the district of Maine.   Petitioner kept its books and records and reported its income during the year in question on an accrual basis.

Petitioner is engaged in the business of conducting two hotels and a radio station at Portland, Maine.   In 1926 and 1927 it issued its 5½ percent first mortgage bonds, due May 1, 1946 (hereinafter called old bonds), in the principal amount of $2,592,000, secured under an indenture of mortgage from it to the Canal National Bank of Portland (hereinafter called Canal Bank), as trustee, dated as of May 1, 1926.

On January 13, 1941, and on all subsequent dates up to the final payment of all bonds of said issue on January 27, 1941, and the dis-

charge of the mortgage, there were outstanding $2,059,000 principal amount of old bonds, on which all coupons to and including those dated November 1, 1940, had been paid. On the same dates $333,500 par value of old bonds was owned by petitioner and held in its treasury and $1,725,500 was held by the public.

On December 20, 1940, Maine Securities Co., representing the dealers therein named, sent a letter to petitioner with reference to a new bond issue in which it is stated:

Confirming our conversation with you and after discussing your suggestions with our associates in the proposed underwriting, we have organized a group of dealers prepared to buy and understand that your Company agrees to sell to that group $1,425,000 out of a total issue of $1,500,000 (the $75,000 balance being retained by the Company as a treasury asset) Congress Square Hotel Company 1st Mortgage 4½s, due Nov. 1961, at a price of 100 and accrued interest to date of delivery. The bonds will be offered and sold only to persons resident within the State of Maine.

On January 13, 1941, petitioner entered into an underwriting contract in letter form with certain named underwriters with reference to the new bond issue. The letter was dated January 11, 1941, addressed to petitioner, and signed by the underwriters. The terms and conditions thereof were accepted by petitioner by endorsement thereon dated January 13, 1941.

The letter of January 11, 1941, states that it supplements the letter of December 20, 1940, that the underwriters severally agree to buy from petitioner specified amounts aggregating $1,425,000 of an issue of $1,500,000 of first mortgage sinking fund 4½ percent bonds dated as of November 1, 1940, due November 1, 1961, at par plus accrued interest to January 27, 1941, delivery to be made by petitioner on January 27, 1941. The letter further provides:

We, jointly and severally, further agree that we will jointly and severally offer said issue of Bonds to persons resident within the State of Maine, including Maine corporations as hereinafter more particularly defined, owning and holding Congress Square Hotel Company 5½s of 1946 (to be called) at a preferential price of 102 and accrued interest and orders from persons resident within the State of Maine holding said 5½s will be given preference over other orders for a limited period of time. The balance of said Bonds will be offered only to persons resident within the State of Maine, including Maine corporations, as hereinafter more particularly defined, at the price of 103 of the principal amount thereof and accrued interest for delivery on or about January 27, 1941. * * *

Congress Square Hotel Company agrees on its behalf that the net proceeds from the issue of Bonds offered in the Descriptive Circular, together with other funds, will be used by it to pay and redeem on or before May 1, 1941, all of the Congress Square Hotel Company First Mortgage 5½s of 1946 now outstanding and that it will furnish the Canal National Bank of Portland, Trustee under the Mortgage Indenture securing said 5½s of 1946, funds sufficient to redeem said Bonds which are to be called for redemption, on May 1, 1941, it being understood that sufficient funds will be deposited with the Trustee on the day and at the time when the underwriters receive and pay for the Bonds sold to them

under this Agreement. You further agree that you will cause a proper Indenture of Mortgage to be executed between Congress Square Hotel Company and The Canal National Bank of Portland, Trustee, and that the Bonds secured thereunder will, in the opinion of Counsel, satisfactory to the undersigned, qualify as legal investments for Savings Banks within the State of Maine and that they will be free of State and Municipal taxation in Maine under existing law.

The validity of the bonds and the indenture securing the same, together with all other legal phases of the issuance, were to meet the approval of counsel for the underwriters who had the joint discretion to terminate the agreement without liability on their part if stated conditions were not complied with by petitioner.

Each one of the underwriters was a security dealer in good standing and repute in the State of Maine and was believed by the petitioner to be financially responsible and able fully to complete and discharge all the obligations assumed under the agreement.

On or prior to January 27, 1941, the various documents necessary in order to complete the transaction, such as notice for call of old bonds, discharge of old mortgage, new issue of $1,500,000 principal amount of first mortgage sinking fund 4½ percent bonds (hereinafter called new bonds) and trust mortgage securing the same, legal opinions of counsel for underwriters, counsel for petitioner, and counsel for trustee, etc., were all prepared. Some of them were executed prior to that date, some not until that day, but all of them were held by the parties executing the same, to be delivered concurrently with the closing of the transaction.

On January 27, 1941, the parties to the contract and officers of the Canal Bank, with their respective counsel, met around the table in the directors' room of the Canal Bank. At that time the underwriters delivered to the petitioner a bank check purchased by them from Canal Bank for the full amount due in accordance with the underwriting agreement for the $1,425,000 par value of new bonds, viz., $1,440,318.75, and $1,425,000 par value of new bonds were delivered by petitioner to the underwriters. Concurrently with such payment by the underwriters to the petitioner and delivery of new bonds to the underwriters, the petitioner utilized such bank check, together with the old bonds then in its treasury and additional cash, to pay to Canal Bank, as trustee under the mortgage securing the old bonds, the full amount due thereon, including the call premium and interest, and received a discharge of the mortgage securing the same. The discharge of the old mortgage was recorded in the proper registry of deeds at one thirty-five in the afternoon of January 27, 1941, and the mortgage securing the new bonds was recorded one minute later.

To the extent that holders of old bonds resident in Maine were willing to acquire the new bonds of the petitioner, the following procedure was adopted:

After having executed the agreement of January 13, 1941, the underwriters, through Maine Securities Co. as manager, mailed a printed notice to each of the holders of old bonds resident in Maine, attached to which was a subscription form addressed to Maine Securities Co. as manager for the underwriters. In response to the printed notice and personal solicitations by the underwriters, the holders of $1,139,500 par value of old bonds subscribed to a like amount of new bonds at the preferential price of $102 plus accrued interest. Acting upon written instructions from Maine Securities Co., old bondholders who had subscribed for $1,085,000 par value of new bonds forwarded their old bonds on or prior to January 27, 1941, to Canal Bank for collection. The commercial department of Canal Bank had been employed by the underwriters to act as their agent in handling the bonds so transmitted as collection items and in forwarding the new bonds to the old bondholders subscribing therefor, together with its check for the interest differential. The charges of Canal Bank for its services in this connection were paid by the underwriters and not by petitioner. Copies of printed forms used by Maine Securities Co. and the commercial department of Canal Bank in handling the transactions are made a part of the stipulation. Upon payment to petitioner of $1,440,318.75 the underwriters received $1,425,000 par value of new bonds from the petitioner and turned $1,085,000 par value thereof over to the commercial department of Canal Bank. The bank mailed the new bonds of that par value to those who had sent in their old bonds therefor, together with its check for the interest differential. The owners of $54,500 par value of old bonds had subscribed for new bonds of equal par value, but because of absence from the state or for other reasons they were not able to send in their old bonds to the Canal Bank on or before January 27, 1941. The underwriters borrowed $36,000 from Canal Bank, secured by pledge of $54,500 new bonds, and, as owners of that par value amount of old bonds sent their bonds to the bank, the bank sent them a like par amount of new bonds, collected from its trust department the call price of the old bonds, and credited the same on the $36,000 note of the underwriters. All arrangements for loans, advances, or collection of the old bonds entered into by underwriters in connection with the transaction here involved were made between the underwriters and the Canal Bank. The petitioner was not a party to such arrangements and assumed no liability therefor.

The notice to old bondholders, to which a subscription form was attached, was signed by petitioner and Main Securities Co. as manager for the underwriters. It states:

Subject to completion of arrangements made for re-financing Congress Square Hotel 1st 5½s, due May, 1946, are to be called for payment at 102 plus interest to the next coupon interest date, which is May 1, 1941.

A new issue of bonds, described in the enclosed circular, has been sold by the Company to the Underwriters whose names appear below. These new bonds are offered to you by the Underwriters, and not by the Congress Square Hotel Company.

As the amount of the new bonds to be issued is considerably less than the amount of old bonds to be called, and as the mortgage securing the new bonds covers the same properties as the old mortgage as well as additional property, it appears obvious that the new bonds are to be better secured than the old bonds.

Believing that many holders of the old bonds will want to exchange for the new, and desiring to afford them that opportunity to the extent to which new bonds are available, the Company has requested and the Underwriters have agreed that the holders of the called 5½s who are resident in Maine shall be given the right to exchange their old bonds for the new bonds upon terms more advantageous than are offered to others.

The price of the new bonds to the public is 103 and accrued interest. To you as a holder of old bonds, the price is 102 and accrued interest on as many bonds of the new as you hold of the old.

BUT

In order to take advantage of this opportunity to secure the preferential price of 102, you must execute the attached form and mail it in the enclosed envelope addressed to the Manager for the Underwriters, so that it will reach him before noon on _____, 1941. Bonds cannot be reserved after that time. As the amount of new bonds to be sold is less than the amount of old bonds believed to be held in Maine, exchange orders will be accepted subject to supply and in order of receipt.

It will not be necessary to send your old bonds with your order for the new bonds. If you subscribe for the new bonds, you will receive seasonably instructions regarding delivery of the old bonds.

The subscription form is directed to Maine Securities Co. as manager for the underwriters and contains blank spaces for the subscriber to insert the amount of old bonds owned and the amount of new bonds subscribed for, with the understanding that the old bonds may be used to pay for the new bonds and that the subscriber is buying the new bonds for his own investment, not for the purpose of resale.

In forms made a part of the stipulation Maine Securities Co., as manager for the underwriters acting as principal, confirms the sale of new bonds to the subscriber "when, as and if issued," states that the new bonds will be delivered to the subscriber by Canal Bank, acting for the underwriters, and directs the subscriber to sign an attached transmittal form and send it with his old bonds to Canal Bank. The transmittal form states that the subscriber, acting under instructions from the underwriters of the new issue, delivers to Canal Bank the old bonds for collection at the call price of $102, plus accrued interest to May 1, 1941, and directs the Canal Bank to apply the proceeds of collection to payment for the principal amount of the new issue subscribed for and to send check for the balance according to confirmation statement. Other forms are delivery instructions by the

manager for the underwriters authorizing and instructing Canal Bank to deliver to the buyer named the new bonds subscribed for and remit the cash balance due him; record of delivery by Canal Bank in accordance with instructions; and form of transmittal by Canal Bank to subscriber for new bonds, together with subscriber's receipt acknowledging delivery of the bonds and check for balance due.

On January 27, 1941, the unamortized discount and expense on $1,725,500 par value of old bonds then outstanding, plus the premium then paid to call such bonds, amounted to $74,559.23. This amount the petitioner deducted from its gross income in its return for the year 1941. In the notice of deficiency the Commissioner of Internal Revenue held that, of said amount of $1,725,500 par value of old bonds then outstanding, a principal amount of $1,142,500 had been exchanged for an equal amount of new bonds and that the proportion of $74,559.23 which $1,142,500 bears to $1,725,500, or $49,367.67, was not an allowable deduction from gross income for 1941, but instead was an expense of issuing new bonds and should be amortized over the life of the new bonds. The position so taken by the Commissioner in the notice of deficiency is the position for which he still contends, but he now concedes that the par value of the new bonds acquired by the old bondholders was $1,139,500 and not $1,142,500, and, therefore, contends that the amount to be disallowed as a deduction for 1941 is $49,238.04 and not $49,367.67.

Both parties rely on Treasury Decision 4603, C. B. XIV-2, p. 58, in support of their respective positions, pertinent portions of which are as follows:

(a) In the case of a retirement of an issue of old bonds from the proceeds of the sale of new bonds any amount paid in excess of the face value of the old bonds, less any amount of premium received when issued and not already returned as income, and any unamortized discount and unamortized expense attributable to such bonds, is deductible in the taxable year of their retirement. * * *

(b) In the case of a retirement of an issue of old bonds in part by exchange for new bonds and in part by payment in cash: (1) In respect of the portion of the old bonds retired with cash any amount paid in excess of the face value of the old bonds, less any amount of premium received when issued and not already returned as income, and any unamortized discount and unamortized expense attributable to such bonds, is deductible in the taxable year of their retirement, subject to the exception stated in paragraph (a) above; (2) in respect of the portion of the old bonds exchanged for new bonds such items shall be amortized over the life of the new bonds.

Petitioner contends that the old bonds were retired from the proceeds of the sale of new bonds and the unamortized discount and unamortized expense attributable to such bonds is deductible in the taxable year 1941 under pargaraph (a) of the above quoted Treasury decision.

The respondent contends that the result of the transaction, viewed as a whole, is that the old bondholders who took new bonds were exchanging old bonds for new with the Congress Square Hotel Co., which had issued both series of bonds, and therefore paragraph (b) of the quoted Treasury decision applies and the unamortized discount and unamortized expense should be amortized over the life of the new bonds. There is no dispute between them as to the amount. Respondent in his brief and argument states that "if the facts indicate that all the old bonds were retired by the proceeds of new bonds, then petitioner was correct in deducting the entire amount of unamortized discount and expense of the old bonds in the year 1941."

This makes the question for our determination largely factual, the answer to be found in a consideration of the facts as stipulated in connection with the exhibits attached and made a part of the stipulation, together with what was intended to be done and what was actually accomplished. Giving due consideration to all these elements, we are of the opinion that respondent was in error in denying the claimed deduction. Clearly the form, and we believe the substance, supports petitioner's contention that the new bonds were sold by petitioner direct to a responsible group of underwriters who bought and paid for them, and the proceeds of the sale were used in part to retire the old bonds. After the proceedings of January 27, 1941, all transactions were solely among the underwriters, the Canal Bank, and the old bondholders; the underwriters had bought and paid for the new bonds, except those retained by petitioner in its treasury, had received delivery thereof, and had assumed full responsibility and all liability in connection with their disposition.

The parties stipulated that on January 27, 1941, the underwriters delivered to petitioner a bank check for the full amount due in accordance with the underwriting agreement for the new bonds and accrued interest, viz., $1,440,318.75, and $1,425,000 par value of new bonds were delivered by petitioner to the underwriters; that "Concurrently with such payment by the underwriters to petitioner and delivery of the new bonds to the underwriters, the petitioner utilized such bank check, together with the old bonds then in its treasury and additional cash, to pay the Canal Bank, as trustee under the mortgage securing the old bonds, the full amount due thereon, including the call premium and interest, and received a discharge of the mortgage securing the same." Thereafter petitioner was out of the picture so far as having anything to do with either the old or new bonds in the refinancing program. The *bona fides* of the sale is not questioned by respondent.

While the underwriters were to offer the new bonds to the holders of the old at a preferential price of $102, as against $103 to pur-

chasers who were not holders of the old bonds, the old bondholders were under no obligation to acquire new bonds by purchase or otherwise. We do not think the fact that the contract fixed the price at which the underwriters would offer the new bonds to the old bondholders or new purchasers within the State of Maine is inconsistent with the finding that the old bonds were purchased outright by the underwriters, nor do we believe that it constituted the underwriters agents for petitioner, as contended by respondent. The parties had a right to contract as they saw fit. Title to the new bonds passed to the underwriters when payment was made and they were delivered to the Canal Bank, acting for the underwriters. We have set forth the facts fully and no useful purpose would be served by repeating them here at greater length in support of the conclusion here reached.

In *Helvering* v. *Union Public Service Co.*, 75 Fed. (2d) 723, under somewhat similar facts the same bank was trustee for both issues and the purchase price paid by the underwriters was used in retiring the previous issue. The court said:

> In the instant case the taxpayer retired its 6 per cent. first mortgage bond issue at a premium of 5 per cent. in cash derived from the sale of its 1928 issue of 5 per cent. first mortgage bonds to a syndicate of investment bankers. This transaction does not involve the substitution or exchange of one issue of bonds for another. The holders of the two bond issues were obviously not the same persons. The fact that the new 5 per cent. issue was sold for the purpose of retiring the old bonds does not alter the conclusion, and the case is not distinguishable in character from one in which the old bond issue is retired before maturity out of surplus or funds made available for that purpose by some other means.
>
> \* \* \* \* \* \* \*
>
> \* \* \* The retirement of the old bonds in cash constituted a closed transaction and a resulting loss attributable to unamortized discount and premiums paid should be treated as realized and deductible in the year of such retirement.

In *Helvering* v. *California Oregon Power Co.*, 75 Fed. (2d) 644, the entire refunding issue was purchased for investment by another corporation and the money paid by the other corporation was used to retire the old bonds. The court held the two issues were not interrelated in any legal sense and the taxpayer was entitled to deduct the unamortized expense of the old bonds in the year they were retired. These cases are not inconsistent with *Great Western Power Co. of California* v. *Commissioner*, 297 U. S. 543, relied upon by respondent; in fact, they were cited with approval by the Supreme Court. However, as the mortgage securing the previously issued outstanding bonds there provided that if the debtors issued new bonds the holders of the old bonds should have the option to receive new bonds of equal par plus cash, the Court held the transaction was between the taxpayer and the holders of the old bonds—that the taxpayer substituted a new obligation for the old—and under such circumstances the remaining

unamortized expenses of the issuance of the old bonds should be amortized over the term of the new bonds. Here, in neither form nor substance can it be said there was "a retirement of an issue of old bonds in part by exchange for new bonds."

*Decision will be entered under Rule 50.*